USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
OLIN CORPORATION,                   :
                                    :
            Plaintiff,              :       18-cv-8197 (JSR)
                                    :
            -v-                     :       OPINION AND ORDER
                                    :
CERTAIN UNDERWRITERS AT LLOYD'S,    :
LONDON and CERTAIN LONDON MARKET    :
INSURANCE COMPANIES,                :
                                    :
            Defendants.             :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

    This is the latest chapter in the saga of Olin Corporation

and its insurers. Over the past several decades, Olin has spent

hundreds of millions of dollars to remediate environmental

damage at numerous sites across North America. During the same

period, Olin has sought coverage from a host of insurers under

policies of general and excess liability insurance, giving rise

to a variety of disputes, the great majority of which have now

been resolved. In this latest action, Olin seeks coverage from

defendants Certain Underwriters at Lloyd's, London and London

Market Insurance Companies (together, "London"), for

expenditures incurred at an Olin-owned manufacturing facility in

Morgan Hill, California. ECF No. 12. London has now moved for

summary judgment, and Olin has moved for partial summary

judgment. The dispositive issue is whether Olin can hold London

jointly and severally liable for all expenditures incurred at

Morgan Hill, or whether Olin can recover only the pro rata amount of expenditures allocated to each London policy period. ECF Nos. 14, 18. For the reasons stated below, London's motion is granted, and Olin's motion is denied. Furthermore, because Olin's damages do not reach the attachment points of London's policies when allocated on a pro rata basis, Olin's complaint is dismissed with prejudice.

## Background

"The background of this interminable litigation has been recounted in countless orders, memoranda, and opinions issued over the past several decades, familiarity with all of which is here, of course, presumed." Olin Corp. v. Lamorak Ins. Co., No. 84-cv-1968 (JSR), 2018 WL 3442955, at *1 (S.D.N.Y. July 17, 2018).[1] However, the following facts, undisputed except where otherwise indicated, are of particular relevance to the motions here before the Court:

From 1956 until at least 1996, Olin operated a manufacturing facility in Morgan Hill, California. Olin Corporation's Memorandum of Law in Support of Its Motion for Partial Summary Judgment to Enforce London's Insurance Policies

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, footnotes, and citations are omitted.

and the Settlement Agreement Which "Shall Apply as Written" 6

("Olin SJ Mem."), ECF No. 19. Olin's operations at the Morgan

Hill site caused property damage, which Olin has spent millions

of dollars remediating. Id.

During the same period that Olin was conducting operations

at Morgan Hill, London issued excess insurance policies to Olin

that indemnified Olin for certain losses associated with third-

party property damage. At issue in the instant litigation are

excess insurance policies that cover periods between 1953 and

1970. Unredacted Complaint Ex. A ("Compl."), ECF No. 12. Some,

but not all, of these policies contain the following provision,

referred to as "Condition C":

> It is agreed that if any loss covered hereunder is also
> covered in whole or in part under any other excess Policy
> issued to the Assured prior to the inception date hereof
> the limit of liability hereon . . . shall be reduced by
> any amounts due to the Assured on account of such loss
> under such prior insurance.
>
> Subject to the foregoing paragraph and to all the other
> terms and conditions of this Policy in the event that
> personal injury or property damage arising out of an
> occurrence covered hereunder is continuing at the time
> of termination of this Policy [London] will continue to
> protect the Assured for liability in respect of such
> personal injury or property damage without payment of
> additional premium.

E.g., ECF No. 21, Ex. 2, at 5.

In assessing this provision, it must be remembered that one

of the central issues in Olin's litigation with its various

3

insurers has been the appropriate method for allocating liability for property damage that is ongoing and progressive over a number of years. The Second Circuit first addressed this issue in Olin Corp. v. Insurance Co. of North America ("Olin I"), 221 F.3d 307 (2d Cir. 2000), in which it considered whether Olin's policies with one of its general liability insurers contemplated a "joint and several liability" (or "all sums") approach, or an "allocation" (or "pro rata") approach. Under the former approach - which Olin argued was mandated by certain language in its policies - each policy would be liable up to its limits for the entirety of progressive property damage, as long as some property damage took place during the period covered by the policy. Id. at 322. Under the latter approach, each policy would be liable only for the property damage attributable to the period covered by the policy. Id.

After reasoning that allocation was preferable from a policy perspective and was "at least consistent with" the admittedly "inconclusive" policy language, the Olin I court decided that "allocation was the proper method to use to determine liability under the policies." Id. at 324-35. The court also held that, in the absence of evidence about the amount of property damage that occurred during each policy

period, it was appropriate to allocate equal amounts based on the time that each policy period covered. Id. at 325.

Two years later, in Consolidated Edison Co. of New York v. Allstate Insurance Co., 774 N.E.2d 687 (N.Y. 2002), the New York Court of Appeals considered a similar policy[2] and held, as the Olin I court had, that "[p]ro rata allocation . . . , while not explicitly mandated by the policies, is consistent with the language of the policies," id. at 695. The court also followed the Second Circuit in holding that pro rata allocation did not require equal allocation based on time, but that such an allocation had not been erroneous. Id.

The next development came in Olin Corp. v. Certain Underwriters at Lloyd's London ("Olin II"), 468 F.3d 120 (2d Cir. 2006), in which the Second Circuit considered the question of when exactly property damage occurs. Both parties assumed that an allocation approach should apply, but they disagreed about the length of the period over which the allocation should be made. This question is significant because the shorter the period, the fewer policies are triggered, and the greater share of remediation costs is allocated to each triggered policy. Olin accordingly argued that property damage continued only until

---

[2] All the insurance contracts involved in this litigation are subject to New York law.

5

full remediation was required, which was a shorter period that generally ended when active pollution stopped. Id. at 128. London, by contrast, argued that property damage took place over a longer period of passive migration, possibly until Olin began remediation. Id.

The Second Circuit purported to adopt "an intermediate approach," but largely sided with London, holding that "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater." Id. at 131. Notably, the Olin II court left open whether remediation costs should be allocated equally to each year, or proportionally based on the amount of damage that actually occurred in each policy period. See id. at 127.

With these rulings in the background, Olin and London entered into a settlement agreement on July 31, 2009 (the "Settlement Agreement" or "Agreement"). ECF No. 17, Ex. B. Under the Agreement, Olin released some, but not all, of its claims against London. Compl. ¶ 11. For certain claims that were not released — including the Morgan Hill claims at issue in this action — the Agreement provided as follows: First, London would be released from liability for any policies that attached below $1.3 million. London Rule 56.1 Statement ¶ 12, ECF No. 16.

6

Second, before seeking coverage from London, Olin would deduct

from its remediation expenditures any payments made prior to the

execution of the Agreement, as well as an additional $10 million

from each claim. ECF No. 17, Ex. B, at 20. Finally, the

Agreement provided that "the terms and conditions of" London's

policies "shall apply as written except as provided in Section

VII, Paragraphs C, D and E." Id.

Paragraphs C and E are not relevant to the instant dispute.

Paragraph D, however, states as follows:

Provided that it is agreed between the Parties or
otherwise determined that there is coverage under the
London Policies, Olin and London Market Insurers agree
that with respect to any future third-party Pollution
Claim relating to property damage that is not the subject
of a release in this Agreement the following allocation
methods shall be used:

(i) For property damage losses relating to Pollution at
real property owned at any time by Olin, the
property damage relating to any Pollution Claim
shall be allocated pro rata equally over the entire
period of time that any operations took place on
any part or parts of the real property Olin owned.

(ii) For property damage losses relating to Pollution at
real property at which Olin disposed of or arranged
for the disposal of any waste that does not
otherwise fall within the scope of Section VII
Paragraph D. (i) above, the property damage relating
to any Pollution Claim shall be allocated pro rata
equally over the entire period of time that any
waste was disposed of or arranged to be disposed of
at any part or parts of the subject real property
by, on behalf of, at the direction or request of
Olin from the commencement of such activities until
their complete cessation.

7

Id. at 21-22.

Over a year after the parties signed the Settlement Agreement, the legal landscape changed again. Olin argued for the first time that it could hold insurers liable for property damage that took place after the end of a policy period, if the policy in question contained Condition C. See Olin Corp. v. Insurance Co. of North America, 84-cv-1968 (S.D.N.Y.), ECF No. 1437. The Second Circuit agreed with Olin in Olin Corp. v American Home Assurance Co. ("Olin III"), 704 F.3d 89 (2d Cir. 2012), holding that the second paragraph in Condition C — referred to as the "continuing coverage provision" — obligated insurers to indemnify Olin for all property damage that took place during and after each policy period, id. at 101-02.

The Olin III court reconciled this outcome with its prior decisions in Olin I and Olin II by holding that the amount of property damage that occurred in each policy period would still be determined on a pro rata basis. Id. at 102. Notably, the court distinguished state court cases that had held that policies containing Condition C were "inconsistent" with a pro rata approach and instead required the imposition of joint and several liability. Id. The court acknowledged that its "prior decisions . . . endorsing the pro rata approach foreclose us from interpreting Condition C as imposing joint and several

8

liability," but it reasoned that the distinguishable state court cases had not relied exclusively on the language of Condition C in determining that the policies they considered imposed joint and several liability. Id. Since the continuing coverage provision contemplated extension of liability after, but not before, a policy period, the court held that Condition C did not replace pro rata allocation with joint and several liability. See id. at 103.

However, despite this attempt by the Second Circuit to square the language of Condition C with the pro rata approach that it had endorsed in prior decisions, the New York Court of Appeals held four years later, in In re Viking Pump, Inc., 52 N.E.3d 1144 (N.Y. 2016), that the language in Condition C compelled the imposition of joint and several liability, id. at 1152. Of note, the Viking Pump court held that "it would be inconsistent with the language of [Condition C] to use pro rata allocation," because Condition C "plainly contemplate[s] that multiple successive insurance policies can indemnify the insured for the same loss or occurrence," whereas "the very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period — meaning that no two insurance policies, unless containing overlapping or concurrent policy periods, would

9

indemnify the same loss or occurrence." Id. at 1153. The court
even went so far as to say that Condition C "cannot logically be
applied in a pro rata allocation," and that under a pro rata
regime, Condition C "would . . . be rendered surplus-age." Id.
at 1154.

The Viking Pump court reasoned that the continuing coverage
provision — on which the Olin III court had relied — further
supported the imposition of joint and several liability, because
"under a pro rata allocation, no policy covers a loss that began
during a particular policy period and continued after
termination of that period." Id. The court rejected the notion
that Olin III had succeeded in "harmonizing" Condition C "with
pro rata allocation," because, in the Viking Pump court's view,
Olin III had mistakenly interpreted New York law as requiring
the imposition of a pro rata regime. See id. at 1155. The court
held that Condition C could not be reconciled with pro rata
allocation, but instead required the imposition of joint and
several liability. Id. at 1156.

Unsurprisingly, after Viking Pump was decided, Olin
returned to court to argue that it could hold insurers jointly
and severally liable for property damage if any of that property
damage was covered by a policy that contained Condition C. In
Olin Corp. v. OneBeacon America Insurance Co. ("Olin IV"), 864

F.3d 130 (2d Cir. 2017), the Second Circuit agreed with Olin, holding that, "under Viking Pump, the insured can pursue any insurer whose policy contains Condition C, and whose policy covers property damage during the relevant period, for all damage reaching the insurer's policy layer regardless of 'when' it took place," id. at 144. Moreover, the court explained, "Viking Pump departs from the 'legal fiction' that property damage can be cleanly allocated between policy years, and instead adopts a joint and several liability theory." Id.

This brings us to the instant dispute. Over the course of the past several years, Olin had sought coverage from London for remediation costs that Olin had incurred at its Morgan Hill site. In an email dated December 16, 2016, for example, Olin notified London that it had spent $66.6 million on remediation at Morgan Hill, of which $18.9 million was incurred after the execution of the Settlement Agreement. ECF No. 17, Ex. E, at 2. Olin stated that it was "evaluating an all sums recovery based upon the decision from the New York Court of Appeals [in] In re Viking Pump." Id.

In a letter dated January 9, 2017, London responded to Olin's email, stating that Olin's expenditures were insufficient to trigger coverage under London's policies. ECF No. 17, Ex. F, at 4. According to London, Olin was required to deduct $10

11

million from the $18.9 million it had incurred after the execution date, and then — pursuant to Paragraph D of the Settlement Agreement — allocate the remaining $8.9 million pro rata equally over the entire period that operations took place at Morgan Hill. Id. Since that period was approximately 40 years, the damages allocated to each of London's policies did not meet the $1.3 million points at which those policies attached. Id.

In a letter dated September 18, 2017, Olin made clear its disagreement with London's position. ECF No. 21, Ex. 18. As of June 30, 2017, Olin stated, it had spent approximately $70 million on remediation at Morgan Hill, of which $19,493,813.78 was incurred after the execution of the Settlement Agreement. Id. at 2. Olin acknowledged that it was required to deduct $10 million from these expenditures, but it disagreed that the remaining $9,493,813.78 should be allocated pro rata. Id. Instead, Olin argued, the full amount was claimable against any London policy that provided coverage during the period that operations took place at Morgan Hill. After accounting for London's release from liability for policies attaching below $1.3 million, this meant that Olin was entitled to coverage of $8,193,813.78. Id.

On September 7, 2018, Olin filed suit in this Court, alleging that London had breached its policies and the Settlement Agreement by failing to provide coverage for Olin's remediation costs at Morgan Hill. ECF No. 12. Olin sought damages, declaratory relief, fees, and costs.

In the instant motions, Olin and London both seek summary judgment on the meaning of Paragraph D of the Settlement Agreement and its interaction with the Condition C provision contained in some of London's policies. ECF Nos. 14, 18. Specifically, London moves for summary judgment on the issue of whether Paragraph D requires Olin's remediation expenditures to be allocated pro rata equally across the period during which operations took place at Morgan Hill. Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Memorandum of Law in Support of Their Motion for Summary Judgment 1-2 ("London SJ Mem."), ECF No. 15; see Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Memorandum of Law in Opposition to Plaintiff Olin Corporation's Motion for Partial Summary Judgment ("London SJ Opp."), ECF No. 23. Since the expenditures, when allocated, do not reach the attachment points of London's policies, London argues that Olin's claims must be dismissed as nonjusticiable. London SJ Mem. 2.

13

Olin, in its motion, seeks partial summary judgment on the issue of whether the Settlement Agreement — and particularly the language that says "the terms and conditions of" London's policies "shall apply as written except as provided in Section VII, Paragraphs C, D and E" — leaves Condition C intact. Olin SJ Mem. 1; see Olin Corporation's Memorandum of Law in Opposition to Defendant Certain Underwriters at Lloyd's, London and Certain London Markets Insurance Companies' Motion for Summary Judgment ("Olin SJ Opp."), ECF No. 25. In other words, Olin seeks a ruling that, notwithstanding Paragraph D, the Settlement Agreement preserves the requirement that London's policies containing Condition C are subject to joint and several liability. Olin SJ Mem. 7.

## Analysis

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in

14

favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).

Under here applicable New York law, "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured." Cragg v. Allstate Indem. Corp., 950 N.E.2d 500, 502 (N.Y. 2011). A reviewing court "must construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 991 N.E.2d 666, 671-72 (N.Y. 2013). In particular, "surplusage is a result to be avoided." Viking Pump, 52 N.E.3d at 1151.

London makes several arguments in favor of its position that Paragraph D imposes a pro rata allocation regime, including on policies that contain Condition C. Of particular relevance to the Court's analysis are London's arguments regarding the text of Paragraph D and its place within the parties' litigation history.[3] With respect to the text, London argues that "the

---

[3] London also argues that Olin's position is foreclosed by this Court's decision in Olin Corp. v. Lamorak Insurance Co., No. 84-cv-1968 (JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018). There the Court remarked in a footnote that, "[i]f [London] is found liable in contribution to Lamorak, the judgment should be

15

express terms of the Settlement Agreement provide that property damages are to be allocated using a specific pro rata allocation formulae." London SJ Mem. 7. Indeed, London observes, "if Olin could recover 'all sums' from any London excess policy containing [Condition C], there would be no reason for the parties to include a pro rata [provision] in the Settlement Agreement to begin with." London SJ Opp. 2-3.

As to litigation history, London contends that pro rata allocation is consistent with prior disputes between London and Olin. London SJ Mem. 11-13. Citing Olin I and Olin II, London argues that a major point of disagreement between the parties was whether property damage should be allocated over a longer or shorter period, and whether it should be allocated equally or by a different method. See id. at 11-12 & n.3. By choosing in Paragraph D to allocate property damage equally across the years of operation at Olin-owned sites (and across the years of

---

reduced by . . . all pre-July 31, 2009 damages, . . . the $10,000,000 automatic deduction from all claims, and . . . any amount which does not exceed the $[1.3] million attachment point of the London policies in any given year after the remaining claim is allocated pro rata from 1952 to the present." Id. at *15 n.15. This language is certainly supportive of London's position, and Olin is wrong to dismiss it as "irrelevant." Olin SJ Opp. 18. However, the interaction between Paragraph D and Condition C was neither fully briefed in the prior litigation, nor directly addressed by the footnote at issue, and Olin is not precluded from raising it here.

16

disposal at non-Olin-owned sites), London argues that the
parties resolved their dispute as to both the period over which
damage occurred and the method of allocation. Id. at 12.

Olin responds with several arguments of its own. On Olin's
view, the text of the Settlement Agreement makes clear that "the
terms and conditions of" London's policies "shall apply as
written except as provided in Section VII, Paragraphs C, D and
E." Given that Paragraph D makes no mention of Condition C, Olin
argues, "London is reduced to arguing that there was some type
of repeal by implication." Olin SJ Mem. 9. Far from imposing a
pro rata allocation regime, Olin continues, Paragraph D defines
when property damage begins and ends, as well as the amount of
property damage in each period. Id. at 10. Once the period and
amounts are defined, Olin argues, "it becomes clear which of the
London Policies are implicated," and one need only "consult the
policy terms 'as written' to assess the liability under each
policy." Id. at 10-11.

Olin contends that its view is further bolstered by the
parties' litigation history, and by the amount of expert trial
testimony devoted to fighting about allocation of property
damage across policy years. Id. at 11. Whereas Olin II left the
parties to prove when contamination stopped spreading, Olin
explains, Paragraph D simplifies the inquiry by requiring the

17

parties to prove only when operations at a site stopped (or, in the case of non-Olin-owned sites, when Olin stopped disposing of waste). See id. Olin also argues that Paragraph D applies equally to policies that do not contain Condition C, "a fact that further indicates [Paragraph D] operates independently of Condition C." Id. at 12.

After carefully reviewing each party's arguments, the Court concludes that London is clearly correct.[4] Beginning with the disputed language in the Settlement Agreement – quoted at greater length above – Paragraph D states as follows:

> Provided that it is agreed between the Parties or otherwise determined that there is coverage under the London Policies, Olin and London Market Insurers agree that with respect to any future third-party Pollution Claim relating to property damage that is not the subject of a release in this Agreement the following allocation methods shall be used:
>
> (i)  For property damage losses relating to Pollution at real property owned at any time by Olin, the property damage relating to any Pollution Claim shall be allocated pro rata equally over the entire period of time that any operations took place on any part or parts of the real property Olin owned.

---

[4] This conclusion makes Olin's strident tone all the more inappropriate. See, e.g., Olin Corporation's Reply Memorandum in Support of Its Motion for Partial Summary Judgment to Enforce London's Insurance Policies and the Settlement Agreement Which "Shall Apply as Written" 7 ("Olin Reply"), ECF No. 30 ("Despite London's howls, London's interpretation of [Paragraph D] violates the tenet that contracts must be construed to give full meaning and effect to all of its provisions."); id. ("[W]hat truly is a 'waste of ink,' . . . is London's argument . . . .").

18

ECF No. 17, Ex. B, at 21-22. As relevant here, "Pollution Claim"
is defined as "any and all Claims relating to Pollution," id. at
8, "Pollution" is defined as "actual, alleged or threatened
pollution, contamination, damage, injury or harm to any land,
soil, watercourse, surface water, ground water, aquifer, body of
water, the air and atmosphere and any other tangible thing,"
id., and "Claim" is defined as "any claim, manner of action,
cause of action, suit, debt, or account," id. at 3.

Read most naturally, Paragraph D and its defined terms
contemplate the following scheme: Olin incurs losses arising
from third-party claims for property damage caused by Olin's
polluting activities. If the property damage takes place at a
site for which London has not been released, Olin may seek
coverage under London's policies for the losses that Olin
incurs. These losses, in turn, are allocated on an equal pro
rata basis over the period (for sites owned by Olin) during
which operations at the site took place. For any given policy
period, London must provide coverage for the allocated pro rata
loss.

Olin appears to agree that this is how Paragraph D operates
when the underlying London policies do not contain Condition C.
In its motion for partial summary judgment, for instance, Olin
gives the example of "London policies covering the years 1956

19

and 1957 that respond to the first $5 million of coverage in excess of the primary insurance as long as there is property damage during those policy years." Olin SJ Mem. 12. Under Paragraph D, Olin argues, "[i]f Olin makes a claim for Morgan Hill under those policies . . . those policies are clearly triggered because Morgan Hill operated during that time." Id. However, Olin argues, "because those policies do not contain Condition C . . ., the policies only cover the property damage allocated to those years." Id.

When the underlying London policies do contain Condition C, however, Olin argues that Paragraph D serves "only to streamline the process of determining which policies were impacted by a particular claim by providing, for example, a defined period of property damage at Olin's sites." Id. at 11. In such cases, Olin contends, "the only question that needs to be answered . . . is, simply, when operations took place at the Morgan Hill Site. Once the period of operations is known, it becomes clear which of the London Policies are implicated." Id. at 10. And "[o]nce there is a determination that those policies are impacted, then one needs to consult the policy terms 'as written' to assess the liability under each policy." Id. at 10-11.

Olin's interpretation of Paragraph D is problematic for several reasons. First, as just illustrated, Olin's position

20

requires different constructions of Paragraph D depending on whether the underlying London policy contains Condition C. Second, and relatedly, Olin's position renders the words "pro rata equally" entirely superfluous when the underlying policy contains Condition C. If Paragraph D simply defined the period of damages in cases where the underlying policy contained Condition C — and if all policies with Condition C imposed joint and several liability — then the effect of Paragraph D would be unchanged if it said only that "the property damage relating to any Pollution Claim shall be allocated . . . over the entire period of time that any operations took place" (or, in the case of non-Olin-owned sites, "over the entire period of time that any waste was disposed of or arranged to be disposed of"). The words "pro rata equally" would be left "without force and effect." Roman Catholic Diocese of Brooklyn, 991 N.E.2d at 671-72.[5]

---

[5] London argues that if Condition C imposed joint and several liability notwithstanding Paragraph D, then "there would have been no reason to have two separate pro rata allocation periods for owned versus non-owned sites" in Paragraph D because Olin "could recover 'all sums' under either scenario." London SJ Opp. 8. This is incorrect, however, because even if Paragraph D defined only the period over which damages occurred (and thus defined only which policies were triggered), different ranges of policies would be triggered depending on whether the period of damages was defined in terms of when operations took place at an Olin-owned site, or in terms of when Olin disposed of waste at a non-owned site. See Olin Reply 7-9.

21

The problems with Olin's reading deepen when one tries to reconcile the text of Paragraph D with the text of Condition C, which is quoted above, and which provides that:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess Policy issued to the Assured prior to the inception date hereof the limit of liability hereon . . . shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

> Subject to the foregoing paragraph and to all the other terms and conditions of this Policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy [London] will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

E.g., ECF No. 21, Ex. 2, at 5.

As just discussed, Paragraph D is most naturally read as allocating Olin's losses to each policy period on an equal pro rata basis. But this means that no "loss covered" under one policy will "also [be] covered in whole or in part under any other . . . Policy," thereby rendering the first paragraph of Condition C inapplicable. As the New York Court of Appeals held in Viking Pump, "it would be inconsistent with the language of [Condition C] to use pro rata allocation," because Condition C "plainly contemplate[s] that multiple successive insurance policies can indemnify the insured for the same loss or occurrence," whereas "the very essence of pro rata allocation is

22

that the insurance policy language limits indemnification to losses and occurrences during the policy period — meaning that no two insurance policies, unless containing overlapping or concurrent policy periods, would indemnify the same loss or occurrence." 52 N.E.3d at 1153.

Similarly, if property damage is allocated to each policy period on an equal pro rata basis, then no "property damage arising out of an occurrence covered" under a policy will be "continuing at the time of termination of" the policy, thereby rendering the second paragraph of Condition C inapplicable as well. The Viking Pump court addressed this issue too, writing that, "under a pro rata allocation, no policy covers a loss that began during a particular policy period and continued after termination of that period." Id. at 1154. At bottom, the most natural reading of Condition C - in the view of this Court and the Viking Pump court - makes clear that the provision "cannot logically be applied in a pro rata allocation." Id. And since Paragraph D imposes a pro rata allocation, Condition C must give way.[6]

---

[6] For similar reasons, Olin is incorrect in arguing that Paragraph D could not have overridden Condition C without referencing it explicitly. As New York courts have long recognized, where there is a "pervading and irreconcilable conflict between" two contracts, "the presumption of law is that

23

In addition to providing the most plausible textual

reading, London's interpretation of Paragraph D makes

significantly more sense than Olin's when viewed in the context

of the parties' litigation history.[7] As discussed above, Olin and

its insurers spent the first decade of the 2000s fighting about

the appropriate method for allocating liability for progressive

property damage. In Olin I, Olin argued that it could hold its

insurers jointly and severally liable under policy provisions

that are not at issue here, but the Second Circuit held that

Olin was limited to recovery on a pro rata basis. 221 F.3d at

324-25. The court left open, however, whether pro rata

allocation required equal allocation to each policy period, id.

_____

the later contract so modified the earlier as to abrogate or
supersede it." In re Callister's Estate, 47 N.E. 268, 269 (N.Y.
1897). The Settlement Agreement was executed long after the
policies at issue, and, as the discussion above makes clear, the
pro rata allocation that Paragraph D imposes is "inconsistent
with the language of" Condition C.

[7] This is not to say, as London argues, that pro rata allocation
was "the law of the case" when the Settlement Agreement was
executed, and that it was therefore incorporated automatically
into the Settlement Agreement. See London SJ Mem. 9-10. As Olin
correctly notes, Olin I, Consolidated Edison, and Olin II did
not hold that all insurance policies impose a pro rata regime
(although the cases did express a policy preference for pro rata
allocation). See Olin SJ Opp. 16-17. Instead, those cases held
that policies with certain language impose pro rata regimes, and
some of the policies affected by the Settlement Agreement —
particularly those with Condition C — contain language
materially different from the language at issue in Olin I,
Consolidated Edison, and Olin II.

24

at 325, and the New York Court of Appeals took a similar approach in Consolidated Edison, 774 N.E.2d at 695.

Not long after, in Olin II, the Second Circuit addressed the issue of the appropriate number of years over which to allocate liability for property damage. Olin argued that liability should be allocated over a shorter timeline, so that the amount allocated to each policy period would be greater. London argued the opposite, and the Second Circuit largely agreed with London, holding that liability should be allocated over the period during which contamination continued to spread, whether through active pollution or passive migration. 468 F.3d at 131. In so holding, the Olin II court - like the Olin I and Consolidated Edison courts - left open whether remediation costs should be allocated equally to each policy period, or proportionally based on the amount of property damage that actually occurred. See id. at 127.

At the time of the Settlement Agreement, then, Olin and its insurers were required to answer two potentially difficult questions each time they wanted to determine how much coverage a given policy provided at a given site: First, when did property damage stop at the site? Second, how much damage should be allocated to each policy period? Paragraph D provides simple answers to both of these questions: First, property damage stops

when operations stop (for Olin-owned sites), or when disposal of waste stops (at non-owned sites). Second, an equal amount of damage should be allocated to each year. Even Olin concedes that these two concerns drove the adoption of Paragraph D.[8] Indeed, it is hard to understand what the parties could have thought they were doing other than enacting a pro rata allocation regime.

## Conclusion

Given these textual and historical considerations, the Court has no difficulty concluding that the Settlement Agreement imposes a pro rata allocation regime, even on London policies that contain Condition C.[9] As a result, the Court hereby grants

---

[8] See Olin SJ Mem. 11 ("The purpose of [Paragraph D] is underscored by the years of fighting between Olin and London over how much property damage should be allocated to which policy years that, at the time of the Settlement Agreement, had consumed much of the expert trial testimony in two separate trials . . . . Those disputes crystallized in the [Olin II] decision . . . , where the court concluded that property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater . . . . Application of that test in practice requires significant and expensive expert testimony, as the trial on remand proved yet again. . . . [Paragraph D] eliminates that test and substituted a test that requires no expert testimony: 'the period of time that any operations took place.'" (internal quotations and citations omitted)).

[9] Because the Court concludes that the Settlement Agreement is unambiguous, it need not consider the parties' arguments regarding the use of parol evidence. See, e.g., London SJ Mem. 12; Olin SJ Opp. 5-16.

London's motion for summary judgment, and it denies Olin's
motion for partial summary judgment. Furthermore, since Olin
does not dispute that its expenditures fail to reach the
attachment points of London's policies when allocated on a pro
rata basis, the Court hereby dismisses Olin's complaint with
prejudice. The Court will reserve judgment, however, on London's
counterclaim for attorneys' fees, which will be argued before
this Court on December 14, 2018.

The Clerk is directed to close the entries at docket
numbers 14 and 18.

SO ORDERED.

Dated:    New York, NY

          November 24, 2018                JED S. RAKOFF, U.S.D.J.